1
                    IN THE UNITED STATES DISTRICT COURT
2                  FOR THE NORTHERN  DISTRICT OF GEORGIA
                              ATLANTA DIVISION
3


4
UNITED STATES OF AMERICA      )
5                             )    NO. 4:08-MJ-21
           V.                 )
6                             )    ATLANTA, GEORGIA
JAMES BARTHOLOMEW HUSKEY      )    JUNE 23, 2008
7    _____)


8

9
                              -  -  -
10


11
                        TRANSCRIPT OF PROCEEDINGS
12         BEFORE THE HONORABLE E. CLAYTON SCOFIELD III
                     UNITED STATES MAGISTRATE JUDGE
13


14
                              -  -  -
15


16

17  APPEARANCES OF COUNSEL:

18
          FOR THE UNITED STATES:   FRANCEY HAKES
19
          FOR THE DEFENDANT:       MATTHEW DODGE
20


21


22
                         DAVID A. RITCHIE
23                      OFFICIAL COURT REPORTER
                        75 SPRING ST., S.W.
24                    ATLANTA, GEORGIA  30303
                          (404) 215-1516
25



                    UNITED STATES DISTRICT COURT

1                          INDEX
                                                   PAGE
2   MICHAEL L. YODER

3        DIRECT BY MS. HAKES                        4
         CROSS BY MR. DODGE                        22
4        REDIRECT BY MS. HAKES                     33

5   SHARON HUSKEY

6        DIRECT BY MR. DODGE                       39
         CROSS BY MS. HAKES                        43
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1            (ATLANTA, FULTON COUNTY, GEORGIA, JUNE 23, 2008, IN

2        OPEN COURT.)

3            THE COURT:  THIS IS THE MATTER OF THE UNITED STATES

4  OF AMERICA VERSUS JAMES BARTHOLOMEW HUSKEY.

5            THIS MATTER HAD AN INITIAL APPEARANCE EARLIER AND IS

6  NOW BEFORE THE COURT FOR A PRELIMINARY HEARING AND A HEARING ON

7  THE GOVERNMENT'S MOTION FOR DETENTION THAT WAS FILED ON JUNE

8  17TH.

9            ALL RIGHT.  MS. HAKES, ARE YOU READY?

10           MS. HAKES:  THE GOVERNMENT IS READY, YOUR HONOR.

11           THE COURT:  ARE YOU READY, MR. DODGE?

12           MR. DODGE:  YES, JUDGE.

13           THE COURT:  ALL RIGHT.  THEN LET'S PROCEED.

14           MS. HAKES:  YOUR HONOR, THE GOVERNMENT INVOKES THE

15  RULE OF SEQUESTRATION.

16           THE COURT:  ALL RIGHT.

17           IF THERE ARE ANY WITNESSES IN THE COURTROOM, THEY

18  MUST REMOVE THEMSELVES.  ANY WITNESSES OR PERSONS WHO MAY BE

19  WITNESSES?

20           MR. DODGE:  WE HAVE ONE AND SHE'S IN THE HALLWAY.

21           THE COURT:  ALL RIGHT.

22           MS. HAKES:  THE GOVERNMENT CALLS SPECIAL AGENT MIKE

23  YODER.

24           THE CLERK:  IF YOU WILL PLEASE RAISE YOUR RIGHT HAND.

25                           - - -


UNITED STATES DISTRICT COURT

1                    MICHAEL L. YODER,

2  CALLED AS A WITNESS ON BEHALF OF THE UNITED STATES, BEING FIRST

3  DULY SWORN, TESTIFIED AS FOLLOWS:

4                         - - -

5          THE CLERK:  PLEASE HAVE A SEAT.  STATE YOUR FULL NAME

6  FOR THE RECORD AND PLEASE SPELL YOUR LAST NAME FOR US.

7          THE WITNESS:  MICHAEL L. YODER, Y-O-D-E-R.

8                    DIRECT EXAMINATION

9  BY MS. HAKES:

10  Q.   SPECIAL AGENT YODER, HOW ARE YOU EMPLOYED?

11  A.   I'M A SPECIAL AGENT WITH THE FBI.

12  Q.   HOW LONG HAVE YOU BEEN WITH THE FBI?

13  A.   APPROXIMATELY ELEVEN AND A HALF YEARS.

14  Q.   ARE YOU ASSIGNED TO ANY PARTICULAR SECTION OR GROUP WITHIN

15  THE FBI?

16  A.   YES, I AM.

17  Q.   AND WHAT IS THAT?

18  A.   I AM ON THE CYBER SQUAD AND WITHIN THAT AN INNOCENT IMAGES

19  NATIONAL INITIATIVE CALLED SAFE CHILD TASK FORCE HERE IN

20  ATLANTA, AND I'VE BEEN ON THAT TASK FORCE FOR APPROXIMATELY

21  FOUR YEARS.

22  Q.   AND WHAT DOES THAT TASK FORCE OR WHAT ARE YOUR DUTIES

23  WITHIN THAT TASK FORCE?

24  A.   WE INVESTIGATE CRIMES DEALING WITH INTERNET CRIMES AGAINST

25  CHILDREN.

1  Q.   AND WOULD THAT INCLUDE THE MANUFACTURE, RECEIPT,

2  DISTRIBUTION AND POSSESSION OF CHILD PORNOGRAPHY?

3  A.   YES, IT DOES.

4  Q.   AGENT YODER, I WANT TO DIRECT YOUR ATTENTION BACK TO A

5  COUPLE OF YEARS AGO IN APPROXIMATELY 2006.  DID A SERIES OF

6  CHILD PORNOGRAPHY AT THAT TIME COME TO THE FBI'S ATTENTION?

7  A.   YES.

8  Q.   IF YOU WOULD DESCRIBE VERY BRIEFLY FOR THE COURT, WHEN I

9  SAY A SERIES OF CHILD PORNOGRAPHY, WHAT DOES THAT MEAN?

10 A.   A SERIES WITH REGARD TO CHILD PORNOGRAPHY IS A VICTIM AND

11 THEY ARE PORTRAYED IN DIFFERENT STATES OF UNDRESS OR DIFFERENT

12 BACKGROUNDS, DIFFERENT SCENARIOS, BUT IT'S THE SAME VICTIM AND

13 THEY ARE SHOWN IN SEXUALLY EXPLICIT MANNER OR HAVING SEX WITH

14 OTHERS.

15 Q.   AND SO BY SERIES, DOES THAT MEAN THAT THERE'S NOT JUST ONE

16 IMAGE OF THE CHILD, THERE ARE MULTIPLE IMAGES OF THE CHILD

17 TAKEN OVER MANY DIFFERENT TIME PERIODS?

18 A.   YES.  IT COULD BE OVER THE SAME APPROXIMATE TIME PERIOD,

19 SEVERAL PHOTOGRAPHS, OR DIFFERENT TIME PERIODS, BUT IT'S THE

20 SAME VICTIM, USUALLY, OR VICTIMS.

21 Q.   HAVE YOU HAD THE OPPORTUNITY TO VIEW AT LEAST SOME OF THE

22 IMAGES THAT ARE ASSOCIATED WITH THE SERIES THAT IS KNOWN AS THE

23 TARA SERIES?  THAT'S T-A-R-A.

24 A.   YES, I HAVE.

25 Q.   DO THOSE INCLUDE VIDEOS AS WELL AS STILL IMAGES?

1  A.   YES.

2  Q.   DO THEY APPEAR TO DEPICT THE SAME CHILD IN EACH IMAGE?

3  A.   YES.

4  Q.   APPROXIMATELY WHAT ARE THE AGES OF THE CHILD OR WHAT IS

5  THE AGE OF THE CHILD DEPICTED ACROSS THE SERIES THAT YOU HAVE

6  SEEN?

7  A.   THE AGES ARE ESTIMATED TO BE APPROXIMATELY FROM AGE FIVE

8  TO AGE NINE.

9  Q.   ALL RIGHT.  NOW, YOU SAID THAT YOU HAVE SEEN AT LEAST SOME

10  OF THESE IMAGES.  DOES THAT MEAN YOU HAVE ALSO SEEN VIDEO

11  IMAGES AS WELL AS STILL IMAGES?

12  A.   YES.

13  Q.   WOULD YOU DESCRIBE IN SUMMARY FORM, PLEASE, SOME OF THE

14  VIDEO IMAGES THAT YOU HAVE SEEN OF THIS CHILD IN THE TARA

15  SERIES?

16  A.   ONE VIDEO, FOR EXAMPLE, SHOWS AN ADULT MALE, ADULT WHITE

17  MALE, WHO IS HAVING ANAL SEX WITH A FEMALE CHILD.  IN THIS ONE

18  THAT I AM THINKING OF PARTICULARLY, THERE ARE MASKS AND --

19  Q.   THAT IS, BOTH PARTIES ARE WEARING A MASK?

20  A.   THEY ARE WEARING A MASK SO YOU CAN'T SEE THEIR FACE.  BUT

21  HE IS HAVING ANAL SEX AND SHE IS PERFORMING ORAL SEX ON HIM.

22  Q.   AND APPROXIMATELY HOW OLD DOES THE CHILD APPEAR IN THAT

23  VIDEO?

24  A.   APPROXIMATELY SEVEN OR EIGHT.

25  Q.   AND COULD YOU DESCRIBE THE PHYSICAL NATURE OF THE ADULT

UNITED STATES DISTRICT COURT

1   WHITE MALE THAT YOU SEE IN THE VIDEO THAT'S WEARING THE MASK?

2   A.   HE IS -- AGAIN, HE IS PERFORMING SEX ON HER.  HE IS

3   PRETTY, AT TIMES, ROUGH WITH THE CHILD AS HE IS PERFORMING SEX

4   ON HER, IN BETWEEN THE SEX ACTS PUSHING HER AROUND OR JUST, IN

5   MY OPINION, TREATING HER PRETTY ROUGHLY.

6   Q.   AND WHAT DOES HE LOOK LIKE, AS MUCH AS YOU CAN SEE OTHER

7   THAN THE MASK?

8   A.   HE IS A LARGE MALE WITH A PROTRUDING STOMACH, HAIRY CHEST.

9   HE LOOKS TO BE A PRETTY LARGE MAN.

10   Q.   AND DOES THE CHILD SEEM AVERAGE SIZE FOR A CHILD THAT AGE?

11   A.   YES.

12   Q.   IS THERE DEPICTED IN ANY OF THE VIDEOS THAT YOU HAVE SEEN,

13   DOES WHAT APPEARS TO BE THE SAME WHITE MALE UTILIZE ANY SEXUAL

14   PARAPHERNALIA ON THE CHILD?

15   A.   YES, HE DOES.

16   Q.   DESCRIBE THAT FOR THE COURT, PLEASE.

17   A.   HE'S USING SEVERAL DIFFERENT TYPES OF OBJECTS, ANYWHERE

18   FROM A VERY LARGE DILDO TO DIFFERENT VIBRATORS TO OTHER

19   HOUSEHOLD OBJECTS THAT HE IS INSERTING BOTH ANALLY AND

20   VAGINALLY.

21   Q.   INTO THE CHILD?

22   A.   INTO THE CHILD.

23   Q.   HAVE YOU SEEN ANY PARTICULAR VIDEOS WHERE THE DEFENDANT IS

24   USING A LARGE DARK VIBRATOR?

25   A.   YES.

1  Q.   WHAT'S HE DOING WITH IT?

2  A.   HE IS INSERTING THAT VIBRATOR OR DILDO INTO -- ANALLY INTO

3  THE GIRL, AGAIN VERY ROUGHLY.

4  Q.   AND HOW DOES SHE REACT?

5  A.   SHE IS -- THE SOUND OF IT SOUNDS LIKE SHE IS IN PAIN.  AND

6  I THINK TOWARDS THE END OF THAT VIDEO HE SHOWS HER ANUS AND

7  IT'S BLOODY AROUND THE EDGES.

8  Q.   YOU SAID THAT THERE IS SOUND IN SOME OF THESE VIDEOS?

9  A.   YES.

10  Q.   IN THE VIDEO THAT YOU HAVE DESCRIBED WHERE HE DISPLAYS HER

11  ANUS FOR THE VIDEO, HOW DOES HE REACT OR WHAT DOES HE SAY OR

12  HOW DOES HE SOUND WHEN HE IS DISPLAYING THAT FOR THE VIDEO OF

13  THE CHILD'S BLOODY ANUS?

14  A.   HE SEEMS TO BE VERY TURNED ON BY THE FACT THAT SHE IS IN

15  PAIN.

16  Q.   ARE THERE ANY VIDEOS OR STILL IMAGES OF THIS PARTICULAR

17  SERIES, THE SAME CHILD, THE SAME WHITE MALE, WHERE A BUTCHER

18  KNIFE IS SHOWN?

19  A.   YES.

20  Q.   DESCRIBE THAT FOR THE COURT, PLEASE.

21  A.   IN THIS VIDEO IT'S BASICALLY A MONTAGE OF STILL IMAGES,

22  BUT THERE IS ONE WHERE HE'S GOT THE KNIFE TO HER THROAT,

23  GRABBING HER HAIR.  THERE'S ANOTHER ONE WHERE SHE'S LAYING DOWN

24  AND HE'S POINTING THE KNIFE INSIDE, ON THE INSIDE OF HER

25  THIGHS.  THERE'S ANOTHER IMAGE WHERE HE IS -- THE TIP OF THE

1   KNIFE IS ON HER VAGINA, ON THE SKIN, SO DIFFERENT VIDEOS

2   PORTRAYING.  AND IT'S THE SAME KNIFE.  IT'S A KITCHEN BUTCHER

3   KNIFE.

4   Q.   AND IT'S THE SAME CHILD AND THE SAME ADULT MALE THAT YOU

5   HAVE DESCRIBED A FEW MINUTES AGO?

6   A.   YES.

7   Q.   ON THE VIDEOS THAT YOU HAVE SEEN DOES THE CHILD APPEAR

8   TO --

9         THE COURT:  HOLD ON ONE SECOND.

10        MA'AM, YOU ARE GOING TO HAVE TO STOP CHEWING BUBBLE

11   GUM BACK THERE.  EITHER GET RID OF IT OR LEAVE THE COURTROOM,

12   PLEASE.

13   BY MS. HAKES:

14   Q.   ON THE VIDEOS THAT YOU HAVE SEEN DOES THE CHILD APPEAR TO

15   COMPLY WITH THE INSTRUCTIONS OF THE PERSON COMMITTING THE

16   ASSAULT EVEN WHEN IT HURTS HER?

17   A.   YES.

18   Q.   AFTER THIS -- WELL, WAS THIS TARA SERIES, WAS THIS BEING

19   DISTRIBUTED AND TRADED WORLDWIDE?

20   A.   YES.

21   Q.   AFTER THE SERIES WAS BROUGHT TO THE ATTENTION OF THE FBI

22   DID YOU ALL START TO MAKE EFFORTS TO LOCATE BOTH THE CHILD AND

23   THE PERPETRATOR?

24   A.   YES.

25   Q.   WOULD YOU DESCRIBE FOR THE COURT WHAT YOU DID, WHAT THE

1  FBI DID TO TRY TO LOCATE THE CHILD?

2  A.   I THINK IT WAS APPROXIMATELY AUGUST 2006 THAT THE FBI

3  STARTED MAKING A CONCERTED EFFORT TO IDENTIFY WHO TARA WAS.

4  MANY DIFFERENT AGENCIES WERE INVOLVED.  I BECAME INVOLVED IN

5  THIS INVESTIGATION ABOUT JANUARY OF THIS YEAR AND THROUGH THAT

6  THERE ARE MANY EXCHANGES OF E-MAILS ABOUT THE DIFFERENT LEVELS

7  OF ANALYSIS AND THE DIFFERENT TIPS THAT WERE BEING PICKED UP

8  THROUGH ANALYSIS OF THE PHOTOGRAPHS AND OF THE VIDEOS.

9  Q.   AND I'M SORRY.  LET ME JUST BACK UP REAL QUICK.  ONE THING

10  I DIDN'T TALK ABOUT.

11        IN THE VIDEOS THAT WERE BEING SHARED ACROSS THE WORLD

12  AND THE STILL IMAGES OF THIS CHILD AND THIS PERPETRATOR, IS

13  THERE EVER A TIME IN THE PUBLIC DOMAIN ON THE INTERNET OR THESE

14  VIDEOS THAT WERE RECOVERED PUBLICLY WHERE YOU CAN SEE THE

15  PERPETRATOR'S FACE OR THE CHILD'S FACE?

16  A.   NO, NOT THE ONES THAT MADE IT ON THE INTERNET.  THOSE --

17  IN THOSE VIDEOS AND PICTURES THEIR FACES WERE EITHER PIXELATED

18  USING COMPUTER GENERATED SOFTWARE TO DISGUISE THE FACE OF BOTH

19  THE PERPETRATOR AND THE GIRL OR THEY WERE WEARING DIFFERENT

20  MASKS.  THEY WERE MARDI GRAS TYPE MASKS.  IN ONE HE WAS WEARING

21  A CLOWN MASK.  SO THERE WERE DIFFERENT MASKS TO HIDE THEIR

22  FACIAL FEATURES.

23  Q.   AND SO THESE DISGUISES AND THE PIXELATION OBVIOUSLY MADE

24  IT MORE CHALLENGING TO FIND THE PEOPLE THAT WERE DEPICTED ON

25  THE VIDEO AND THE IMAGES?

1   A.   THAT'S TRUE.

2   Q.   SO YOU SAID THERE WERE LOTS OF TIPS AND DIFFERENT AGENCIES

3   WORKING.  WERE YOU ALL LOOKING AT IMAGES OR THINGS THAT WERE

4   SHOWN IN THE VIDEOS, BACKGROUNDS AND THAT KIND OF THING, TO TRY

5   TO IDENTIFY THE LOCATION OF THIS CHILD?

6   A.   YEAH.  THAT WAS THE MAJORITY OF IT.  THERE'S DIFFERENT

7   INVESTIGATIVE TECHNIQUES THAT WERE USED, ANYWHERE FROM

8   ORIGINATION OF NEW IMAGES TO THE BACKGROUND OF THE IMAGES TO

9   THE METADATA THAT'S EMBEDDED INTO THE IMAGES.

10  Q.   SO THINGS LIKE BEDSPREADS, THINGS ON THE WALLS, ART, CARS,

11  ALL THE THINGS THAT APPEARED IN THE BACKGROUND OF THE TARA

12  SERIES WERE USED TO TRY TO NARROW DOWN A LOCATION?

13  A.   YES.

14  Q.   EVENTUALLY DID THOSE THINGS LEAD YOU SPECIFICALLY TO

15  WALKER COUNTY, GEORGIA, TO THE HUSKEY HOUSEHOLD?

16  A.   YES.

17  Q.   WERE THERE DEPICTED IN THE TARA SERIES VIDEOS AND STILL

18  IMAGES A PONTIAC VEHICLE AND A WHITE VAN?

19  A.   YES.

20  Q.   BEFORE YOU WENT TO WALKER COUNTY TO THE RESIDENCE OF THE

21  HUSKEYS, WERE YOU ABLE TO DETERMINE THAT THOSE TWO VEHICLES

22  WERE OWNED BY THE HUSKEYS AND AT THAT RESIDENCE IN WALKER

23  COUNTY?

24  A.   YES.

25  Q.   AND WALKER COUNTY IS IN THE NORTHERN DISTRICT OF GEORGIA;

1    IS THAT RIGHT?

2    A.   THAT'S CORRECT.

3    Q.   LAST MONDAY NIGHT DID YOU AND OTHER AGENTS WITH THE FBI

4    AND LOCAL AGENTS GO TO THE HUSKEY RESIDENCE TO INVESTIGATE

5    WHETHER OR NOT THE DEFENDANT OR THE PERSON SHOWN IN THE TARA

6    SERIES LIVED AT THAT RESIDENCE?

7    A.   YES.

8    Q.   WOULD YOU DESCRIBE FOR THE COURT WHAT OCCURRED WHEN YOU

9    ARRIVED AT THE HUSKEY RESIDENCE IN WALKER COUNTY?

10   A.   WHEN WE ARRIVED, IT WAS A LITTLE BIT BEFORE 10:00 P.M. AND

11   WE KNOCKED ON THE DOOR.  MR. HUSKEY CAME TO THE DOOR AND --

12   Q.   AND THAT IS THIS DEFENDANT HERE IN THE COURTROOM?

13   A.   YES, IT IS.

14          WE ASKED IF WE COULD TALK TO HIM AND ALSO, WHEN WE

15   SAT HIM DOWN, WE ASKED IF WE COULD DO A SEARCH OF THE

16   RESIDENCE.  HE SAID YES TO BOTH, ALLOWED US INTO THE RESIDENCE.

17   OTHER AGENTS WERE INTERVIEWING HIM.  I INTERVIEWED MS. HUSKEY.

18          AGAIN, WE GOT A CONSENT TO SEARCH THE RESIDENCE, AND

19   AS I DID MY INITIAL WALK-AROUND OF THE HOUSE, I NOTICED THINGS

20   IN THE BACKGROUND OR THINGS IN THE HOUSE THAT WERE SIMILAR TO

21   IMAGES THAT I ASSOCIATE WITH THE TARA SERIES.

22   Q.   WAS THERE A YOUNG GIRL FOUND THERE IN THE HOUSE AS WELL?

23   A.   YES.

24   Q.   DID SHE APPEAR TO YOU TO BE THE CHILD THAT IS -- OR, AT

25   LEAST, I UNDERSTAND YOU SAID YOU HAD ONLY SEEN PIXELATIONS OF

1  HER FACE OR HER WEARING MASKS.  DID SHE APPEAR OF THE SAME

2  OVERALL SIZE AND DESCRIPTION OF THE CHILD IN THE TARA SERIES?

3  A.   YES.

4  Q.   SO YOU SAID YOU WERE LOOKING AROUND THE HOUSE AND YOU

5  NOTED CERTAIN THINGS.  DID YOU GO INTO THE DEFENDANT'S BEDROOM?

6  A.   YES.

7  Q.   DID YOU NOTICE IN THE DEFENDANT'S BEDROOM ANY KIND OF

8  COVERS ON THE BED?

9  A.   YES, I DID.

10  Q.   AND DID THE COVERS ON THE BED LOOK LIKE ANYTHING THAT YOU

11  HAD SEEN BEFORE IN VIDEOS OR STILL IMAGES?

12  A.   YES.  IT LOOKED LIKE THE SAME COVERS THAT WERE IN THE TARA

13  SERIES PICTURES.

14  Q.   DID YOU FIND A KITCHEN KNIFE OR BUTCHER KNIFE OF A TYPE

15  THAT APPEARED TO BE THE ONE THAT YOU HAD SEEN A PERSON

16  ASSAULTING THAT YOUNG CHILD THAT YOU HAVE MENTIONED HOLD TO THE

17  CHILD'S GENITALS?  DID YOU FIND THAT IN THE HUSKEY HOUSE?

18  A.   YES, I DID.

19  Q.   DURING A SUBSEQUENT SEARCH OF THE HUSKEY RESIDENCE WAS

20  THERE ANY SEXUAL PARAPHERNALIA FOUND?

21  A.   YES.

22  Q.   WAS THAT IN A LOCKED CLOSET?

23  A.   YES.

24  Q.   WOULD YOU PLEASE DESCRIBE SOME OF THE THINGS THAT WERE

25  FOUND IN A LOCKED CLOSET IN THE HUSKEY RESIDENCE?


UNITED STATES DISTRICT COURT

1  A.   THERE WERE TWO OR THREE -- I'M NOT SURE OF THE NUMBER, BUT

2  THERE WERE TWO OR THREE VIBRATORS/DILDOS IN THIS LOCKED CLOSET,

3  AS WELL AS I GUESS SOME PHOTOGRAPHS THAT I HAVEN'T SEEN YET.

4  Q.   THESE VIBRATORS OR DILDOS, DID ANY OF THEM APPEAR TO BE

5  THE ONES THAT YOU HAVE SEEN OR THAT OTHER AGENTS HAVE SEEN

6  DEPICTED IN THE TARA SERIES VIDEO THAT YOU HAVE DESCRIBED

7  EARLIER?

8  A.   THAT I'M NOT SURE OF.

9  Q.   DO THEY FIT THE GENERAL DESCRIPTION?

10  A.   YES.

11  Q.   DID ANYONE IN THE HOUSEHOLD TELL YOU TO WHOM THOSE THINGS

12  IN THE CLOSET, IN THE LOCKED CLOSET, BELONGED?

13  A.   YES.  THAT LOCKED CLOSET WAS DESCRIBED AS ITEMS BELONGING

14  TO THE DEFENDANT AND THAT ONLY HE HAD THE KEY TO IT.

15  Q.   DID AGENTS TALK TO THE DEFENDANT THERE ON THE SCENE?

16  A.   YES.

17  Q.   WAS THE DEFENDANT ASKED ABOUT WHETHER OR NOT HE HAD BEEN

18  THE PERSON WHO HAD BEEN DEPICTED IN THE TARA SERIES VIDEOS?

19  A.   YES.

20  Q.   AND WHAT DID HE SAY?

21  A.   WITHOUT VERY MUCH PROMPT HE ADMITTED THAT HE, THAT HE HAD

22  BEEN SEXUALLY MOLESTING THIS GIRL AND THAT HE WAS SHOWING OR

23  POSTING PICTURES AND VIDEOS OF HER ON THE INTERNET.

24  Q.   DID THE DEFENDANT DESCRIBE HOW LONG HE'D BEEN SEXUALLY

25  ASSAULTING THIS CHILD?

1   A.   YES, HE DID.  HE SAID SEVERAL YEARS.

2   Q.   DID THE DEFENDANT DESCRIBE AT ALL THE KIND OF SEXUAL

3   ASSAULTS THAT HE HAD PERPETRATED ON THE CHILD?

4   A.   YES, HE DID.  FROM WHAT I SAW, HE INITIALLY TRIED TO

5   MINIMIZE HIS LEVEL OF CONTACT, BUT HE ADMITTED THAT HE

6   PERFORMED ANAL SEX, TRIED TO PERFORM VAGINAL SEX, AND HAD

7   PERFORMED ORAL SEX AND THAT SHE HAD PERFORMED ORAL SEX ON HIM.

8   Q.   AND ALL OF THOSE THINGS YOU HAVE SEEN DEPICTED ON THE

9   VIDEOS?

10  A.   YES.

11  Q.   AND THE DEFENDANT ADMITTED THAT HE WAS UPLOADING THOSE

12  PARTICULAR IMAGES OF HIM ASSAULTING THE CHILD TO THE INTERNET?

13  A.   YES.

14  Q.   WAS THE CHILD WHO IS DEPICTED IN THE TARA SERIES THAT WAS

15  FOUND IN MR. HUSKEY'S HOUSE, WAS SHE INTERVIEWED AS WELL?

16  A.   SHE WAS INTERVIEWED LATER, YES.

17  Q.   WHAT DID SHE SAY?

18  A.   SHE DISCLOSED THAT SHE HAD BEEN HAVING A SEXUAL

19  RELATIONSHIP WITH THE DEFENDANT FOR SEVERAL YEARS; THAT THE

20  LATEST SEXUAL ACT WAS EARLIER THAT DAY, WHERE HE HAD PERFORMED

21  ANAL SEX ON HER.

22  Q.   WAS SHE ASKED SPECIFICALLY WHETHER IT WAS THE DAY THAT YOU

23  ARRESTED THE DEFENDANT?

24  A.   YES.  FROM WHAT I UNDERSTAND, IT'S EARLIER THAT DAY, AND

25  THAT THEY PERFORMED -- THAT THEY HAD SEX FREQUENTLY AND ALL THE

1  DIFFERENT ACTS.

2  Q.   DID THE CHILD DESCRIBE THAT THE DEFENDANT USED THESE

3  SEXUAL PARAPHERNALIA ON HER?

4  A.   YES.

5  Q.   DID SHE ALSO DESCRIBE WHETHER OR NOT OR DID SHE TELL YOU

6  ALL WHETHER OR NOT SHE KNEW THE DEFENDANT WAS UPLOADING HER

7  IMAGES OF THE ASSAULT TO THE INTERNET?

8  A.   YES.  SHE SAID THAT THE DEFENDANT HAD SHOWN HER

9  PORNOGRAPHIC IMAGES OF HER FROM AGE FIVE ALL THE WAY TO PRESENT

10 AND THAT SHE KNEW THAT THOSE IMAGES WERE UPLOADED ONTO THE

11 INTERNET FOR OTHERS.

12 Q.   AND THE CHILD IS NOW NINE; IS THAT CORRECT?

13 A.   THAT'S CORRECT.

14 Q.   WAS THE CHILD ASKED WHY SHE DID NOT TELL ANYONE ABOUT THE

15 SEXUAL ASSAULTS BY THE DEFENDANT FOR ALL THOSE YEARS?

16 A.   YES, SHE DID.  SHE SAID THAT SHE DIDN'T WANT TO GET THE

17 DEFENDANT INTO TROUBLE.

18 Q.   DID YOU SEIZE A COMPUTER OR ANY KIND OF COMPUTER MEDIA

19 FROM THE DEFENDANT'S HOME?

20 A.   YES.

21 Q.   HAVE YOU HAD THE CHANCE TO DO A BRIEF WHAT'S NORMALLY

22 CALLED A PREVIEW OF THE DEFENDANT'S COMPUTER?

23 A.   YES.

24 Q.   AND THAT PREVIEW, THAT'S NOT FULL FORENSICS; IS THAT

25 CORRECT?

1   A.   THAT'S CORRECT.

2   Q.   BUT YOU HAVE VIEWED AT LEAST SOME OF THE STORAGE MEDIA

3   THAT THE DEFENDANT POSSESSED, CORRECT?

4   A.   CORRECT.

5   Q.   WOULD YOU DESCRIBE FOR THE COURT, PLEASE, WHAT YOU FOUND

6   ON THE DEFENDANT'S STORAGE MEDIA?

7   A.   JUST IN THIS QUICK PREVIEW WE DISCOVERED APPROXIMATELY

8   FOUR TO FIVE THOUSAND IMAGES OF CHILD PORNOGRAPHY.  THERE ARE

9   THREE DIFFERENT DISTINCT FOLDERS.  THE FIRST ONE HAS WHAT I

10  WOULD DETERMINE TO BE JUST NORMAL CHILD PORNOGRAPHY, IMAGES

11  THAT I RECOGNIZE FROM OTHER INVESTIGATIONS, SOME THAT WE KNOW

12  OF, WE KNOW WHO THE VICTIMS ARE.

13          IN THE SECOND FOLDER THERE ARE IMAGES AND VIDEOS THAT

14  ARE NOT, THAT ARE NOT PIXELATED OR MASKED IN ANY WAY, AND SO

15  YOU COULD SEE BOTH THE VICTIM'S FACE AND THE DEFENDANT'S FACE

16  IN THOSE SERIES OF VIDEOS AND IMAGES.

17  Q.   AND THOSE IMAGES CONTAIN CHILD PORNOGRAPHY?

18  A.   AND THOSE ARE IMAGES OF THE DEFENDANT HAVING SEX WITH THE

19  VICTIM.

20  Q.   AND THAT'S THE CHILD THAT YOU FOUND AT THE DEFENDANT'S

21  RESIDENCE WHEN YOU WENT AND ARRESTED HIM LAST MONDAY NIGHT?

22  A.   THAT'S CORRECT.

23  Q.   THE THIRD FOLDER?

24  A.   AND THE THIRD FOLDER HAD WHERE HE ALTERED THE IMAGES,

25  WHERE HE WOULD PIXELATE THE FACES OR HE WOULD PUT BARS OVER

1 THEM OR HE WOULD CUT OUT THE BACKGROUND OR HE WOULD TYPE IN

2 CERTAIN SCRIPT ONTO THE IMAGES THEMSELVES.  SO THOSE WERE

3 ALTERED.

4 Q.   AND SOME OF THE IMAGES THAT YOU FOUND YOURSELF ON THIS

5 DEFENDANT'S COMPUTER MEDIA YOU HAVE SEEN IN THE COURSE OF THIS

6 INVESTIGATION AS HAVING BEEN RECOVERED FROM OTHER DEFENDANTS

7 AND OTHER PEOPLE ACROSS THE WORLD?

8 A.   YES.

9           MS. HAKES:  YOUR HONOR, MAY I APPROACH THE WITNESS?

10          THE COURT:  YOU MAY.

11 BY MS. HAKES:

12 Q.   I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED FOR

13 GOVERNMENT'S IDENTIFICATION PURPOSES GOVERNMENT'S EXHIBIT

14 NUMBER 1.  DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT NUMBER 1?

15 A.   YES, I DO.

16 Q.   AND WHAT IS THAT?

17 A.   THAT'S A CD AND IT'S GOING TO HAVE SEVERAL VIDEOS OF SEX

18 ACTS BETWEEN THE DEFENDANT AND THE GIRL.

19 Q.   IN ONE PARTICULAR VIDEO IS THE FACE OF THE DEFENDANT

20 CLEARLY VISIBLE?

21 A.   YES.

22 Q.   WHAT ABOUT THE FACE OF THE CHILD, IS IT CLEARLY VISIBLE?

23 A.   YES.

24 Q.   WHERE DOES THAT VIDEO APPEAR TO HAVE BEEN TAKEN TO YOU?

25 A.   THAT WAS TAKEN IN HIS HOME IN HIS MASTER BEDROOM, AND I

1  RECOGNIZE THE BACKGROUND ON THE WALL AS BEING IN HIS MASTER

2  BEDROOM.

3          MS. HAKES:  YOUR HONOR, THE GOVERNMENT TENDERS FOR

4  PURPOSES OF THIS HEARING ONLY GOVERNMENT'S 1.

5          THE COURT:  ANY OBJECTION?

6          MR. DODGE:  NO OBJECTION.

7          THE COURT:  IT'S ADMITTED.

8          MS. HAKES:  ASK TO PUBLISH THE IMAGE THAT WE HAVE

9  JUST DESCRIBED JUST TO THE COURT.

10         THE COURT:  ALL RIGHT.  AND COUNSEL HAS SEEN IT?

11         MS. HAKES:  YES, SIR.

12         THE COURT:  ALL RIGHT.

13         MS. HAKES:  MAY I APPROACH, YOUR HONOR?

14         THE COURT:  YES.

15         HOW LONG IS THIS?

16         MS. HAKES:  JUST A FEW MINUTES, YOUR HONOR.

17         (GOVERNMENT'S 1 PUBLISHED TO THE COURT ONLY)

18  BY MS. HAKES:

19  Q.   AND JUST FOR PURPOSES OF THE RECORD, AGENT YODER, WHEN YOU

20  SEE THE VIDEO, IS THE DEFENDANT PERFORMING ANAL SEX ON THE

21  CHILD IN THIS VIDEO?

22  A.   YES, HE IS.

23         MS. HAKES:  YOUR HONOR, I THINK THAT'S ALL.  THAT'S

24  ENOUGH UNLESS THE COURT --

25         THE COURT:  ALL RIGHT.  THAT'S ALL YOU WANTED TO

UNITED STATES DISTRICT COURT

1    SHOW?

2           MS. HAKES:  YES, SIR.

3           THE COURT:  ALL RIGHT.

4    BY MS. HAKES:

5    Q.   AGENT YODER, DURING THE COURSE OF YOUR REVIEW OF THE

6    VIDEOS ASSOCIATED IN THIS CASE OF THE DEFENDANT ASSAULTING THE

7    CHILD THAT WE'LL CALL TARA, SINCE THAT'S THE NAME OF THE

8    SERIES, DOES THE DEFENDANT CALL HER NAMES?

9    A.   YES.

10   Q.   DOES HE SAY THINGS LIKE SLUT AND WHORE TO THE CHILD?

11   A.   YES, HE DOES.

12   Q.   DURING THE COURSE OF YOUR INVESTIGATION WERE YOU ABLE TO

13   DISCOVER WHAT THE DEFENDANT'S PROFESSION IS?

14   A.   YES.

15   Q.   WHAT DOES HE DO FOR A LIVING?

16   A.   HE IS A TENNIS COACH, I GUESS ON A CONTRACTUAL OR

17   PERSON-BY PERSON BASIS, NOT NECESSARILY EMPLOYED BY THE

18   RECREATION DEPARTMENT, BUT HE CONTRACTS OUT TO TRAIN KIDS

19   TENNIS.  AND I THINK THE AGE GROUP IS 13 AND 17, BUT I ALSO

20   SAW -- AND I NEED TO VERIFY, BUT IT ALSO LOOKS LIKE HE'S IN AN

21   ORGANIZATION WHERE HE IS AFFILIATED WITH EVEN YOUNGER KIDS THAN

22   THAT.

23   Q.   DURING THE COURSE OF YOUR INVESTIGATION HAVE YOU BEEN ABLE

24   TO DISCOVER WHETHER OR NOT THIS DEFENDANT, WHILE HE WAS

25   TEACHING TENNIS TO GIRLS, WAS TRAVELING WITH GIRLS THROUGHOUT

1   THE STATE AND TO SOME OF THE OTHER STATES HERE IN THE SOUTHEAST

2   REGION?

3   A.   YES.  IT SEEMED LIKE, AS THE GIRLS WERE GOING TO DIFFERENT

4   TENNIS MATCHES, THAT HE WOULD TRAVEL WITH THEM.

5   Q.   ACCORDING TO YOUR INVESTIGATION, DID YOU LEARN WHETHER OR

6   NOT THE DEFENDANT, WHEN HE WOULD TRAVEL AND STAY IN VARIOUS

7   HOTEL ROOMS, WOULD HE TAKE THE CHILD TARA ALONG WITH HIM?

8   A.   THAT'S MY UNDERSTANDING RIGHT NOW, YES.

9        MS. HAKES:  YOUR HONOR, MAY I HAVE JUST A MOMENT?

10        THE COURT:  YES.

11   BY MS. HAKES:

12   Q.   IN CASE I DIDN'T MAKE THIS CLEAR, YOU HAVE DESCRIBED THAT

13   YOU RECOGNIZE THE BACKGROUND AS THE DEFENDANT'S BEDROOM OF THE

14   PARTICULAR VIDEO THAT WE HAVE JUST SHOWN IN COURT?

15   A.   YES.

16   Q.   ARE THERE OTHER BACKGROUNDS THAT APPEAR THROUGH THIS

17   PRELIMINARY INVESTIGATION IN THE STAGE IT'S IN NOW TO BE

18   SEVERAL OTHER HOTEL ROOMS LOCATED YOU DON'T KNOW WHERE?

19   A.   THAT'S CORRECT.

20   Q.   AND DID THE CHILD DESCRIBE BEING SEXUALLY ASSAULTED BY THE

21   DEFENDANT IN VARIOUS HOTEL ROOMS LOCATED THROUGHOUT THE

22   SOUTHEAST?

23   A.   YES.

24        MS. HAKES:  THANK YOU.  THAT'S ALL I HAVE, YOUR

25   HONOR.


UNITED STATES DISTRICT COURT

```
 1              THE COURT:  ALL RIGHT, MR. DODGE.

 2              MR. DODGE:  THANK YOU, JUDGE.

 3                        CROSS-EXAMINATION

 4  BY MR. DODGE:

 5  Q.   GOOD AFTERNOON, AGENT YODER.

 6  A.   GOOD AFTERNOON.

 7  Q.   YOU HAVE INVESTIGATED MR. HUSKEY'S PERSONAL BACKGROUND,

 8  RIGHT?

 9  A.   VERY LIMITED, BUT YES.

10  Q.   WELL, YOU KNOW THAT HE WAS RAISED IN NORTHWEST GEORGIA,

11  RIGHT?

12  A.   YES.

13  Q.   YOU KNOW THAT HE HAS LIVED IN THE SAME HOME FOR ABOUT 20

14  YEARS?

15  A.   NO, I DIDN'T KNOW THAT.

16  Q.   YOU KNOW THAT HIS PARENTS LIVE ALSO IN NORTHWEST GEORGIA

17  NOT FAR FROM THE TOWN WHERE HE LIVES?

18  A.   THESE ARE THINGS THAT I DON'T KNOW YET, NO.

19  Q.   YOU HAVEN'T DISCOVERED ANY OF THIS?

20  A.   NO.

21  Q.   YOU KNOW THAT HE HAS NO CRIMINAL HISTORY WHATSOEVER,

22  RIGHT?

23  A.   YES, I DID KNOW THAT.

24  Q.   HE HAS NEVER BEEN ARRESTED IN HIS LIFE UNTIL LAST MONDAY,

25  RIGHT?
```

UNITED STATES DISTRICT COURT

```
 1   A.   THAT'S CORRECT.

 2   Q.   AND HE IS ABOUT 38 YEARS OLD?

 3   A.   AS FAR AS I UNDERSTAND, HE'S 38 YEARS OLD.

 4   Q.   AND HE'S BEEN TEACHING TENNIS AT THE REC CENTER FOR ABOUT

 5   SEVEN YEARS, RIGHT?

 6   A.   I THINK HE TOLD ME ABOUT EIGHT YEARS.

 7   Q.   OKAY.  AND YOU DON'T KNOW THAT THAT'S INACCURATE, RIGHT?

 8   A.   NO.

 9   Q.   AS FAR AS YOU KNOW THAT'S CORRECT?

10   A.   YES.

11   Q.   NOW, WHEN YOU KNOCKED ON THE DOOR LAST MONDAY NIGHT, HE

12   ANSWERED THE DOOR HIMSELF?

13   A.   YES.

14   Q.   HE SPOKE TO YOU, RIGHT?

15   A.   YES.

16   Q.   HE INVITED YOU IN?

17   A.   YES.

18   Q.   HE DID NOT TRY TO FLEE?

19   A.   NO.

20   Q.   HE DID NOT TRY TO ASSAULT YOU OR THE OTHER AGENTS?

21   A.   NO, HE DID NOT.

22   Q.   HE DIDN'T RUN IN THE HOUSE AND BARRICADE HIMSELF IN A

23   ROOM?

24   A.   NO.

25   Q.   NONE OF THAT, RIGHT?  HE DIDN'T OFFER YOU ANY RESISTANCE
```

1  AT ALL?

2  A.   NO.

3  Q.   AND WHEN YOU SAT DOWN WITH HIM AND STARTED ASKING HIM

4  QUESTIONS, HE SPOKE TO YOU FREELY, RIGHT?

5  A.   YES.

6  Q.   HE NEVER MADE ANY THREATS TO YOU OR ANYONE ELSE, RIGHT?

7  A.   AS FAR AS I KNOW, NO.

8  Q.   NOW, YOU SPOKE TO HIM THAT EVENING AT THE HOUSE AND DID

9  YOU INTERVIEW HIM YOURSELF OR DID OTHER AGENTS INTERVIEW HIM AT

10  THE HOUSE?

11  A.   OTHER AGENTS INTERVIEWED HIM.  I DID HAVE A CHANCE BRIEFLY

12  TO SPEAK TO HIM AFTER THAT INTERVIEW AS WE WERE DOING OTHER

13  THINGS.

14  Q.   WHERE DID YOUR CONVERSATION OCCUR WITH HIM?

15  A.   IT WAS IN THE KITCHEN/DINING ROOM.  IT WAS LIKE A

16  KITCHENETTE TABLE.

17  Q.   AND WHAT WAS THE CONTENT OF THAT CONVERSATION?

18  A.   WELL, THE MAJOR INTERVIEW WAS DONE AT THAT POINT.  I WAS

19  ASKING HIM ABOUT SPECIFICALLY IF HE HAD ANY INFORMATION ABOUT

20  ANY OTHERS THAT HE WAS DEALING WITH THIS, ANY OTHER NAMES TO

21  SEE IF THERE WAS ANY EXPANSION OF THE INVESTIGATION, AND HIS

22  ANSWERS WERE NEGATIVE.

23  Q.   NOW, YOU SAID THE MAJOR PART OF THE INTERVIEW WAS ALREADY

24  COMPLETE.  THAT HAD BEEN DONE BY OTHER AGENTS, RIGHT?

25  A.   THAT'S CORRECT.


UNITED STATES DISTRICT COURT

1  Q.   WAS THAT INTERVIEW RECORDED ON AUDIO OR VIDEO?

2  A.   NO.

3  Q.   THE NEXT DAY WHEN YOU ALL DROVE TO ATLANTA FOR COURT,

4  ANOTHER FBI AGENT HAD ANOTHER CONVERSATION WITH MR. HUSKEY,

5  RIGHT?

6  A.   THAT'S CORRECT.

7  Q.   AND DURING THAT CONVERSATION MR. HUSKEY AGAIN ANSWERED THE

8  QUESTIONS THAT WERE PUT TO HIM ABOUT THIS CASE, RIGHT?

9  A.   THAT'S MY UNDERSTANDING IS THAT HE ANSWERED QUESTIONS,

10 YES.

11 Q.   AND MR. HUSKEY ALSO AGREED TO PUT A SHORT STATEMENT IN

12 WRITING THE NIGHT THAT YOU ARRESTED HIM, MONDAY NIGHT, RIGHT?

13 A.   THAT'S CORRECT.

14 Q.   AND DURING THAT STATEMENT HE CLAIMED THAT HE HAD NOT

15 UPLOADED ANY IMAGES OR VIDEOS SINCE OCTOBER 2007, RIGHT?

16 A.   THAT WAS HIS -- OCTOBER, YES.  THAT WAS HIS STATEMENT,

17 YES.

18 Q.   AND IN YOUR OWN INVESTIGATION OF THE TARA SERIES, YOU

19 DISCOVERED THAT THERE HAD NOT BEEN ANY ADDITIONAL IMAGES

20 UPLOADED IN THE TARA SERIES TO THE PUBLIC SINCE AROUND NOVEMBER

21 OF 2007; IS THAT RIGHT?

22 A.   WELL, THAT'S NOT ENTIRELY TRUE.  THAT'S INFORMATION THAT I

23 KNEW OF AS OF ABOUT JANUARY OF 2008, THAT THE LAST IMAGES WERE

24 UPLOADED IN NOVEMBER OF 2007.  I DON'T HAVE AN UPDATE OF THAT

25 PART OF THE INVESTIGATION TO SHOW OR TO HAVE ANY KNOWLEDGE OF

1  ANY IMAGES OR VIDEOS THAT WERE UPLOADED SINCE I GOT THAT

2  INITIAL INFORMATION IN JANUARY OF 2008.

3  Q.   YOU PRESENTED AN AFFIDAVIT TO JUDGE SCOFIELD LAST TUESDAY

4  WHERE YOU DESCRIBED YOUR INVESTIGATION, RIGHT?

5  A.   YES.

6  Q.   AND YOU SIGNED YOUR NAME UNDER OATH THAT THIS INFORMATION

7  WAS ACCURATE, RIGHT?

8  A.   YES.

9  Q.   AND IN THAT AFFIDAVIT IN PARAGRAPH TEN YOU SAID THAT THE

10  MOST RECENT IMAGES TRANSMITTED TO THIS ENTERPRISE OCCURRED

11  DURING NOVEMBER OF 2007, RIGHT?

12  A.   I THINK THAT'S WHAT I JUST SAID IS THAT THE INFORMATION

13  THAT I HAVE IS THAT THE LAST IMAGES, VIDEOS, WERE UPLOADED IN

14  NOVEMBER 2007.  THAT'S THE LAST INFORMATION THAT I HAVE.

15  Q.   AND THAT IS ABOUT SEVEN MONTHS OR SO AGO, RIGHT?

16  A.   YES.

17  Q.   DID YOU SEARCH ANY AUTOMOBILES AT THE HOUSE LAST MONDAY

18  NIGHT OR TUESDAY OR ANY TIME SINCE THEN?

19  A.   BOTH OF THEIR VEHICLES WERE THERE.  I DON'T HAVE ANY

20  KNOWLEDGE OF ANYONE SEARCHING THOSE.  I DIDN'T SEARCH THOSE.  I

21  KNOW WE TOOK SEVERAL PICTURES OF THE OUTSIDE, BUT I DON'T HAVE

22  ANY INFORMATION ABOUT THE INTERIOR.

23  Q.   DID YOU SEIZE THE CARS AND TAKE POSSESSION OF THEM?

24  A.   NO, WE DID NOT.

25  Q.   AND HOW MANY COMPUTERS DID YOU TAKE POSSESSION OF?

1  A.   IT WAS -- I BELIEVE THERE WAS ONE COMPUTER WITH OTHER

2  ACCESSORIES ASSOCIATED WITH THAT COMPUTER.

3  Q.   BY "ACCESSORIES" YOU MEAN WHAT IN PARTICULAR, LIKE AN

4  EXTERNAL HARD DRIVE?

5  A.   LIKE AN EXTERNAL HARD DRIVE.

6  Q.   OKAY.  ONE EXTERNAL HARD DRIVE?

7  A.   I BELIEVE SO, YES.

8  Q.   AND YOU OR OTHER AGENTS INTERVIEWED THE OTHER PEOPLE AT

9  THE HOUSE THAT NIGHT WHEN YOU ARRIVED, RIGHT?

10  A.   YES.

11  Q.   AND YOU DESCRIBED A MOMENT AGO THE INTERVIEW WITH RH AND

12  WE'LL TALK ABOUT THAT IN A MINUTE.  YOU ALSO DESCRIBED THE

13  TENNIS COACH AND THE CHILDREN WHO TOOK TENNIS LESSONS AND

14  INSTRUCTION FROM MR. HUSKEY.

15        HAVE YOU OR OTHER AGENTS, EITHER WITH YOUR AGENCY OR

16  THE GBI, FOR EXAMPLE, INTERVIEWED ANY OF THOSE KIDS?

17  A.   WELL, THERE'S -- AN INVESTIGATION IS ONGOING.  SO --

18  Q.   YOU ARE NOT AWARE AS YOU SIT HERE NOW OF ANY OTHER CHILD

19  BESIDES RH WHO HAS MADE THIS ACCUSATION AGAINST MR. HUSKEY,

20  RIGHT?

21  A.   WE HAVE SOME INFORMATION THAT IS CREATING LEADS THAT WE

22  ARE FOLLOWING THAT MAY LEAD TO OTHERS.  THERE HAVE BEEN SOME

23  CALLS TO LAW ENFORCEMENT AGENCIES, ONE WHICH I TOOK DIRECTLY,

24  WHERE PEOPLE, DIFFERENT PEOPLE IN THE COMMUNITY ARE MAKING

25  CLAIMS THAT WE ARE INVESTIGATING.  AND I CAN'T TELL YOU RIGHT

1  NOW THAT THOSE ARE SOLID, BUT WE DO HAVE SOME INDICATIONS AND

2  SOME ADDITIONAL LEADS SINCE LAST MONDAY THAT WE ARE FOLLOWING

3  UP ON AND SOME OF THOSE INCLUDE CHILDREN THAT THE DEFENDANT,

4  MR. HUSKEY, HAS TRAINED AS A COACH.

5  Q.   WELL, IT'S A LONG ANSWER TO MY QUESTION, WHICH IS FAIRLY

6  SHORT, WHICH IS NO OTHER INTERVIEWS HAVE BEEN DONE WITH KIDS

7  WHO MADE SIMILAR ACCUSATIONS?

8  A.   YES, THERE HAVE BEEN INTERVIEWS WITH KIDS.

9  Q.   NONE HAVE MADE SIMILAR ACCUSATIONS TO THE ACCUSATIONS THAT

10  RH HAS MADE, RIGHT?

11  A.   WELL, THERE'S -- CAN YOU REPHRASE THE "SIMILAR ACTIONS"

12  PART OF THIS?

13  Q.   NO OTHER CHILDREN HAVE ACCUSED MR. HUSKEY OF ANY KIND OF

14  SEXUAL ABUSE.

15  A.   THAT'S NOT TRUE.

16  Q.   NOW, THE CHILD THAT WAS THE SUBJECT OF YOUR TESTIMONY, RH,

17  HAS BEEN PLACED IN THE PROTECTIVE CUSTODY OF THE STATE, RIGHT?

18  A.   YES.

19  Q.   NOW, AS AN FBI AGENT YOU HAVE RECEIVED A NUMBER OF PHONE

20  CALLS OR TIPS RELATED TO THIS CASE THAT YOU JUST SAID A MOMENT

21  AGO THAT YOU ARE INVESTIGATING, RIGHT?

22  A.   THAT'S CORRECT.

23  Q.   AS YOU KNOW AS AN AGENT THAT SOME TIPS TURN OUT TO BE

24  VALID, SOME ALSO TURN OUT TO BE BOGUS, RIGHT?

25  A.   THAT'S TRUE.

1  Q.    THE VIDEOS IN THE TARA SERIES WITHOUT FAIL WERE -- THE

2  FACES WERE EITHER MASKED OR PIXELATED, RIGHT?  THE VIDEOS THAT

3  WERE UP ON THE INTERNET.

4  A.    YES.

5  Q.    AND THE DESCRIPTION THAT YOU GAVE OF THE MAN IN THOSE WAS

6  A LARGE MALE WITH A PROTRUDING STOMACH, A HAIRY CHEST, A PRETTY

7  LARGE MAN, RIGHT?

8  A.    YES.

9  Q.    NOW, THAT'S A DESCRIPTION THAT WOULD APPLY TO A LOT OF MEN

10 IN THIS COUNTRY, RIGHT?

11 A.    YES, IT WOULD.

12 Q.    AND IT WAS CLEAR FROM THE MASKING AND THE PIXELATION THAT

13 THAT WAS DONE WITH THE EFFORT TO DISGUISE OR CONCEAL THE

14 IDENTITIES OF THE PEOPLE IN THE VIDEOS, RIGHT?

15 A.    YES.

16 Q.    YOU SAID THAT WHEN YOU WENT TO THE HOUSE, YOU AND THE

17 OTHER AGENTS ON MONDAY NIGHT, YOU GOT CONSENT TO SEARCH THE

18 HOUSE.  WHO IN PARTICULAR GAVE YOU CONSENT TO SEARCH THE HOUSE?

19 A.    WELL, THE DEFENDANT DID AND INDEPENDENTLY OF THAT

20 MRS. HUSKEY DID.

21 Q.    AND YOU DESCRIBED SOME BED COVERS IN THE DEFENDANT'S

22 BEDROOM.  IS THERE MORE THAN ONE BEDROOM IN THE HOUSE?

23 A.    YES.

24 Q.    HOW MANY BEDROOMS DO YOU RECALL IN THAT HOUSE?

25 A.    THREE.

1  Q.   AND WERE YOU ABLE TO FIGURE OUT WHO LIVED IN WHICH OF THE

2  BEDROOMS?

3  A.   YES.

4  Q.   DID MR. HUSKEY AND MRS. HUSKEY SHARE A BEDROOM?

5  A.   AS FAR AS I COULD TELL, YES.

6  Q.   AND IN FACT YOU CALLED IT EARLIER THE MASTER BEDROOM?

7  A.   YES.

8  Q.   YOU SAID THAT IN THE CLOSET THAT YOU FOUND SOME

9  PARAPHERNALIA, INCLUDING TWO OR THREE VIBRATORS AND DILDOS,

10  RIGHT?

11  A.   YES.

12  Q.   OF COURSE, IT'S NOT A CRIME TO POSSESS THOSE ITEMS BY

13  THEMSELVES, RIGHT?

14  A.   NO, IT'S NOT.

15  Q.   AND THOSE ARE NOT UNCOMMON SEX TOYS THAT ARE USED BY

16  PEOPLE WHO ARE DOING THINGS PERFECTLY LEGAL, RIGHT?

17  A.   THAT'S NOT -- I THINK THAT'S NOT THE POINT OF THIS.  IT'S

18  THAT THEY WERE IN A LOCKED BOX.  THAT'S THE UNCOMMON PART OF

19  THIS.

20  Q.   DID MR. HUSKEY HAVE ANY KEYS ON HIM WHEN YOU ARRESTED HIM

21  IN HIS OWN CLOTHING OR HIS HANDS, HIS PHYSICAL POSSESSION?

22  A.   NO.

23  Q.   YOU SAID SOMEBODY DESCRIBED THE CLOSET AS HIS AND THAT HE

24  IS THE ONLY ONE THAT HAD A KEY TO IT.  WHO TOLD YOU THAT?

25  A.   HIS WIFE DID.

1  Q.   YOU SAID INITIALLY MR. HUSKEY TRIED TO MINIMIZE THE LEVEL

2  OF CONTACT WITH RH.  THAT WAS YOUR PHRASE, RIGHT?

3  A.   YES.

4  Q.   BUT THAT EVENTUALLY HE BEGAN TO ADMIT MORE DETAILED

5  CONTACT, RIGHT?

6  A.   (INDICATING).

7  Q.   WOULD YOU EXPLAIN TO US WHAT YOU MEANT BY THOSE PHRASES?

8  A.   OKAY.  I THINK INITIALLY HE SAID THAT HE HAD HAD SEXUAL

9  CONTACT WITH RH ANYWHERE FROM A FEW TIMES TO MAYBE 10 OR 20

10 TIMES, AND I THINK LATER ON HE ADMITTED THAT HE HAD SEXUAL

11 CONTACT WITH HER MORE OFTEN THAN THAT AND THAT IT HAD OCCURRED

12 OVER A PERIOD OF TWO AND A HALF TO THREE YEARS.  AND HE SAID IN

13 THIS LATER STATEMENT THAT THERE WAS A PERIOD OF TIME WHERE HE

14 WAS TRYING TO AVERT HIS ADDICTION AND THAT HE WOULD JUST WATCH

15 HER MASTURBATE AND VIDEOTAPE HER MASTURBATE AS A WAY TO CONTROL

16 HIS ADDICTION.

17 Q.   WAS THAT A RECENT DEVELOPMENT?

18 A.   WHAT DO YOU MEAN BY "RECENT"?

19 Q.   THE EFFORT TO SORT OF SCALE BACK AND ASK HER TO MASTURBATE

20 WITH HIM.

21 A.   I DON'T KNOW WHAT TIME PERIOD THAT WAS, BUT HE SAID IT WAS

22 ABOUT A NINE-MONTH PERIOD OF TIME THAT HE WAS NOT HAVING SEX

23 WITH HER BUT HE WAS JUST VIDEOTAPING HER MASTURBATING.

24 Q.   NOW, MS. HAKES ASKED YOU IF YOU ASKED THE CHILD, RH, WHY

25 DIDN'T SHE TELL ON HIM, AND WHAT YOU SAID IS THAT SHE SAID, "I

UNITED STATES DISTRICT COURT

1  DIDN'T WANT TO GET HIM IN TROUBLE," RIGHT?

2  A.   CORRECT.

3  Q.   NOW, YOU ARE AWARE THAT THERE ARE SOME CASES IN WHICH

4  WITNESSES STAY QUIET BECAUSE THE SUSPECT HAS THREATENED THEM,

5  RIGHT?

6          MS. HAKES:  YOUR HONOR, I'M GOING TO OBJECT TO

7  WHATEVER MIGHT BE GOING ON IN OTHER CASES.  IT'S NOT RELEVANT

8  HERE.

9          THE COURT:  IT'S A HYPOTHETICAL.

10  BY MR. DODGE:

11  Q.   WELL, IT'S NOT A CASE IN WHICH RH SAID THAT SHE KEPT HER

12  MOUTH SHUT BECAUSE SHE HAD BEEN THREATENED HARM, RIGHT?

13          THE COURT:  THAT'S A DIFFERENT QUESTION.

14          THE WITNESS:  MY UNDERSTANDING IS THAT SHE DIDN'T SAY

15  THAT, NO.

16  BY MR. DODGE:

17  Q.   THESE IMAGES ON THE COMPUTER THAT YOU TALKED ABOUT A FEW

18  MOMENTS AGO IN THE THREE FOLDERS THAT YOU LOCATED, WHEN DID YOU

19  DO THAT PREVIEW OF THE COMPUTER?

20  A.   I SAW THOSE IMAGES ON THURSDAY.

21          MR. DODGE:  ONE MOMENT, PLEASE.

22          I HAVE NO MORE QUESTIONS.

23          THANK YOU.

24          THE COURT:  ANY REDIRECT?

25          MS. HAKES:  YES, YOUR HONOR.


UNITED STATES DISTRICT COURT

```
 1                    REDIRECT EXAMINATION

 2   BY MS. HAKES:

 3   Q.   AGENT YODER, WHEN THE CHILD VICTIM HERE WAS INTERVIEWED

 4   THE DAY AFTER THE DEFENDANT'S ARREST, YOU HAVE DESCRIBED

 5   EARLIER THAT SHE SAID THAT THE DEFENDANT HAD ANALLY ASSAULTED

 6   HER ON THE DAY OF THE ARREST, CORRECT?

 7   A.   CORRECT.

 8   Q.   DID SHE MENTION WHETHER OR NOT THE DEFENDANT HAD UPLOADED

 9   THOSE IMAGES TO THE INTERNET ON THAT DAY?

10   A.   SHE SAID THAT THOSE IMAGES WERE UPLOADED ON THE INTERNET

11   THAT DAY.

12   Q.   AND WAS THE CHILD SPECIFICALLY ASKED ABOUT THE LARGE

13   VIBRATOR THAT WAS FOUND IN THE DEFENDANT'S HOUSE?

14          LET ME JUST REPHRASE THAT.  WAS SHE ASKED TO EXPLAIN

15   IF THE DEFENDANT EVER TOLD HER WHAT HIS PURPOSE WAS IN MAKING

16   HER BLEED IN THE ANUS WHEN HE USED THE VIBRATOR REPEATEDLY IN

17   HER ANUS?

18   A.   YES.  SHE SAID THAT THE PURPOSE OF THE LARGE

19   DILDO/VIBRATOR WAS TO OPEN HER UP FOR SEX.

20          MS. HAKES:  THANK YOU.  THAT'S ALL.

21          THE COURT:  MR. DODGE, ANYTHING ON THAT LAST POINT?

22          MR. DODGE:  NO, JUDGE.

23          THE COURT:  YOU MAY STEP DOWN, AGENT YODER.

24          MS. HAKES:  THE GOVERNMENT HAS NO FURTHER WITNESSES

25   OR EVIDENCE, YOUR HONOR.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  ALL RIGHT.  MR. DODGE, ANY EVIDENCE OR

2   WITNESSES FOR THE DEFENDANT?

3          MR. DODGE:  NOT ON THE ISSUE OF PROBABLE CAUSE.  I

4   WILL ON THE ISSUE OF DETENTION.

5          THE COURT:  ALL RIGHT.  WELL, LET'S ADDRESS PROBABLE

6   CAUSE FIRST, SINCE THE EVIDENCE IS COMPLETE ON THAT.

7          MR. DODGE, DO YOU WISH TO BE HEARD ON PROBABLE CAUSE?

8          MR. DODGE:  NO, JUDGE.

9          THE COURT:  WELL, I DO FIND THAT THE GOVERNMENT HAS

10  SHOWN SUFFICIENT EVIDENCE TO ESTABLISH PROBABLE CAUSE FOR THE

11  OFFENSE CHARGED IN THE COMPLAINT, WHICH IS A VIOLATION OF TITLE

12  18, SECTION 2251A, CHARGING THE DEFENDANT WITH HAVING EMPLOYED,

13  USED, PERSUADED, INDUCED OR ENTICED OR COERCED A MINOR TO

14  ENGAGE IN SEXUALLY EXPLICIT CONDUCT FOR THE PURPOSE OF

15  PRODUCING ANY VISUAL DEPICTION OF SUCH CONDUCT AND DID KNOW, OR

16  HAVE REASON TO KNOW, THAT SUCH VISUAL DEPICTION WOULD BE

17  TRANSPORTED IN INTERSTATE OR FOREIGN COMMERCE BY ANY MEANS,

18  INCLUDING A COMPUTER.  SO I DO FIND THERE IS PROBABLE CAUSE FOR

19  THE CHARGE SET FORTH IN THE COMPLAINT.

20         ALL RIGHT.  ON THE ISSUE OF DETENTION, THEN LET'S

21  TAKE IT IN ORDER.

22         WHAT DOES THE GOVERNMENT RELY ON FOR DETENTION?  AND

23  THEN I WILL HEAR FROM THE DEFENDANT AS WELL.

24         MS. HAKES:  YOUR HONOR --

25         THE COURT:  OF COURSE, IS THERE ANY OTHER EVIDENCE?

1          MS. HAKES:  NO, YOUR HONOR.

2          THE COURT:  THE PRETRIAL SERVICES REPORT?

3          MS. HAKES:  JUST SUBMIT THE PRETRIAL SERVICES REPORT,

4    YOUR HONOR, TO THE COURT.  I BELIEVE IT APPEARS CORRECT TO THE

5    GOVERNMENT.

6          IF EVER THERE WERE A CASE FOR DETENTION, YOUR HONOR,

7    THIS IS IT.  IN OTHER CASES IN WHICH I HAVE APPEARED BEFORE THE

8    COURT AND ASKED FOR DETENTION, THE DEFENSE ATTORNEYS ARE FOND

9    OF STANDING UP AND SAYING THERE'S JUST NO VICTIMS AND SO THERE

10   IS REALLY NO DANGER TO THE COMMUNITY.

11         WELL, HERE IS A DIFFERENT CASE FOR THEM TO ARGUE

12   ABOUT.  THIS IS A REBUTTABLE PRESUMPTION CASE, YOUR HONOR, AS

13   YOU ARE WELL AWARE.  THAT MEANS CONGRESS HAS DETERMINED THAT

14   MR. HUSKEY IS ENTIRELY TOO DANGEROUS TO BE LET OUT INTO THE

15   COMMUNITY, ANY COMMUNITY, NOT JUST ATLANTA, NOT JUST WALKER

16   COUNTY, BUT TRION OR ANYWHERE ELSE THE DEFENDANT WANTS TO ARGUE

17   HE OUGHT TO BE LET GO.  BECAUSE I'M NOT AWARE OF ANY

18   COMMUNITIES IN THIS STATE THAT HAVE NO CHILDREN.  I AM NOT

19   AWARE OF ANY COMMUNITIES IN THIS STATE THAT HAVE NO SCHOOLS,

20   LIBRARIES, PARKS, OR RECREATION CENTERS.

21         THIS DEFENDANT IS A TENNIS COACH BY PROFESSION.  HE

22   HAS ALL SORTS OF ACCESS TO CHILDREN.  AND I AM SURE THAT

23   MR. DODGE, ONE OF HIS ARGUMENTS, HE IS GOING TO STAND UP BEFORE

24   THE COURT AND TELL YOU THAT THIS DEFENDANT DIDN'T THREATEN THE

25   CHILD, SHE DIDN'T SAY HE THREATENED THE CHILD.  I WOULD ARGUE

1  TO THE COURT THAT WHAT HE HAS DONE TO THIS CHILD IS FAR, FAR

2  WORSE.

3          YOU HEARD AGENT YODER TESTIFY THAT THE CHILD WAS

4  COMPLIANT WITH THE DEMANDS MADE BY HER ASSAULTER EVEN WHEN IT

5  HURT HER; THAT HE USED A LARGE VIBRATOR TO ANALLY PENETRATE

6  HER, MADE HER BLEED, AND EXPLAINED TO HER THAT IT WAS SO SHE

7  COULD BE OPENED UP FOR SEX.

8          YOU SAW THE VIDEO.  THIS DEFENDANT CLEARLY IS

9  DEPICTED IN IT.  CLEARLY A SMALL CHILD WHO HE DWARFS IN SIZE IS

10  UNDERNEATH HIM ON HIS OWN BED IN THAT CHILD'S HOUSE, A PLACE

11  MOST CHILDREN CAN LOOK TO FOR SAFE HARBOR.  BUT INSTEAD OF SAFE

12  HARBOR, WHAT DID THIS DEFENDANT GIVE HER?  PAIN AND AGONY FOR

13  THE REST OF HER LIFE.  THIS CHILD WILL NEVER BE THE SAME.

14          HE ASSAULTED HER FROM THE AGE OF FIVE TO THE AGE OF

15  NINE AND DID WHATEVER HE TOLD HER.  HOW CAN SHE RECOVER FROM

16  THAT?  THE DAMAGE TO THIS CHILD THAT HE HAS DONE IS

17  INCALCULABLE AND I DON'T PRETEND TO UNDERSTAND IT MYSELF.  DID

18  HE CARE?  NO.  INSTEAD HE SENT IT OUT OVER THE INTERNET FOR

19  OTHER PEOPLE TO VIEW HIS REPEATED VIOLENT ASSAULTS ON A LITTLE

20  TINY GIRL.

21          YOU SAW IN THE VIDEO AT ONE POINT, AS HE IS ANALLY

22  RAPING THE CHILD, HE LEANS FORWARD AND LOOKS DIRECTLY INTO THE

23  CAMERA, APPARENTLY MAKING SURE THE CAMERA ANGLE IS GOOD ENOUGH

24  TO CAPTURE THIS RAPE OF THE CHILD IN HER OWN HOUSE.  THAT IS

25  WHO THIS DEFENDANT IS.

1      NOW, YOU NOTICE THE GOVERNMENT DID NOT ASK AGENT

2  YODER ABOUT ANY OTHER TIPS OR ANY OTHER CHILDREN COMING

3  FORWARD, BECAUSE THIS INVESTIGATION IS ONGOING, BUT MR. DODGE

4  ASKED AND THAT IS A CONCERN TO THE GOVERNMENT AND I AM GUESSING

5  A CONCERN TO THE COURT, WHETHER OR NOT THERE ARE ANY CONDITIONS

6  OR COMBINATION OF CONDITIONS THAT CAN ASSURE THIS DEFENDANT'S

7  APPEARANCE IN COURT OR THE SAFETY OF THE COMMUNITY.

8      THIS PENALTY FOR THIS CRIME, YOUR HONOR, CARRIES A

9  15-YEAR MANDATORY MINIMUM PENALTY.  AND WHILE MR. DODGE IS

10  CORRECT THAT AT THIS MOMENT THE CHILD IS IN PROTECTIVE CUSTODY,

11  I ASKED AGENT YODER A VERY SPECIFIC QUESTION FOR A VERY

12  SPECIFIC REASON, WHETHER OR NOT THE CHILD WAS COMPLIANT IN

13  SPITE OF THE FACT THAT IT HURT HER.

14      THE GOVERNMENT HAS SEVERAL CONCERNS IN THIS CASE

15  ABOUT THE DEFENDANT GETTING OUT ON BOND BUT PRIMARY AMONG THEM

16  IS HIS POTENTIAL ACCESS TO THIS CHILD.  NO GPS TRACKER IS GOING

17  TO KEEP HIM AWAY FROM THIS CHILD.  IF HE CALLS HER, IF HE

18  CONTACTS HER, SHE MIGHT GO WITH HIM, BECAUSE THAT IS HOW

19  COMPLIANT SHE WAS.  THIS CHILD SAID SHE DIDN'T REPORT HIM

20  BECAUSE SHE DIDN'T WANT HIM TO GET IN TROUBLE.

21      WHAT WILL HAPPEN IF THE DEFENDANT CUTS HIS CUFF OFF

22  AND GOES WHEREVER SHE IS?  AND IT'S A VERY SMALL COMMUNITY.

23  THERE IS NO WAY TO ASSURE THIS CHILD'S SAFETY.  HE HAS READ THE

24  COMPLAINT.  HE HAS HEARD THE EVIDENCE.  HE KNOWS THIS CHILD HAS

25  NOW REPORTED HIM.  HE NOW KNOWS THE GOVERNMENT'S EVIDENCE IN

UNITED STATES DISTRICT COURT

1  THIS CASE.  WHO KNOWS WHAT HE WOULD DO TO THAT CHILD, OR ANY

2  OTHER FOR THAT MATTER.

3          NOW HE NO LONGER HAS ACCESS TO HER.  LET'S SAY FOR

4  PURPOSES OF ARGUMENT WE CAN ASSURE THE CHILD'S SAFETY.  WHAT

5  ABOUT THE REST?  HE IS VIOLENT.  HE USES KNIVES.  IT SEXUALLY

6  AROUSES HIM.  HE EVEN ADMITTED TO BEING ADDICTED.  WELL, HOW

7  CAN WE LET SOMEONE ADDICTED TO THE VIOLENT SEXUAL ASSAULT OF

8  LITTLE GIRLS OUT INTO THE COMMUNITY?  HOW MANY LITTLE GIRLS

9  WOULD BE PUT AT RISK?  BECAUSE THIS DEFENDANT KNOWS HE, IF HE

10  IS CONVICTED, IS GOING TO PRISON FOR A VERY LONG TIME.  WHO

11  KNOWS WHAT KIND OF DESPERATION THAT GENERATES?

12          FLIGHT IS A REAL ISSUE HERE GIVEN THE PENALTIES THAT

13  THIS DEFENDANT FACES.  THERE IS A MAXIMUM FOR THIS OFFENSE

14  ALONE OF 30 YEARS AND, LIKE I SAID, A MINIMUM OF 15 YEARS, NOT

15  TO MENTION OTHER POTENTIAL CHARGES THAT MAY BE OUT THERE, YOUR

16  HONOR.

17          THIS DEFENDANT IS AS CLEAR A RISK OF FLIGHT AND

18  ESPECIALLY DANGER TO THE COMMUNITY AS ANY DEFENDANT THIS COURT

19  WILL EVER HAVE SITTING IN THE CHAIR.  HIS CRIMES ARE AS HEINOUS

20  AS ANY THAT HAVE EVER BEEN THOUGHT OF IN THE SICK MINDS OF

21  PREDATORS LIKE HIM.

22          ANY MAN WHO CAN GET SEXUAL PLEASURE AND SATISFACTION

23  FROM SEEING THE BLOODY ANUS OF AN EIGHT-YEAR-OLD IS DANGEROUS

24  AND WE WOULD ASK THE COURT TO DETAIN HIM.

25          THE COURT:  MR. DODGE?

UNITED STATES DISTRICT COURT

1          MR. DODGE:  JUDGE, WE DO CALL ONE WITNESS AND THEN

2  I'VE GOT A RESPONSE TO THE CLOSING ARGUMENT FROM MS. HAKES A

3  MOMENT AGO.

4          THE COURT:  ALL RIGHT.

5          MR. DODGE:  WE CALL SHARON HUSKEY, WHO IS IN THE

6  HALLWAY.  IF YOU WOULD GIVE ME A MOMENT, JUDGE?

7          THE COURT:  ALL RIGHT.

8          THE CLERK:  YOU CAN PUT YOUR PURSE DOWN.

9          PLEASE RAISE YOUR RIGHT HAND TO BE SWORN.

10          DEPUTY MARSHAL:  JUST SET YOUR PURSE DOWN, MA'AM.

11          THE WITNESS:  SORRY?

12          DEPUTY MARSHAL:  SET YOUR PURSE DOWN, PLEASE.

13          THE WITNESS:  SORRY.

14          THE CLERK:  MA'AM, IF YOU COULD PLEASE RAISE YOUR

15  RIGHT HAND TO BE SWORN.

16                        - - -

17                   SHARON HUSKEY,

18  CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFF, BEING FIRST

19  DULY SWORN, TESTIFIED AS FOLLOWS:

20                        - - -

21          THE CLERK:  PLEASE HAVE A SEAT AND PLEASE STATE YOUR

22  FULL NAME FOR THE RECORD.

23          THE WITNESS:  MY NAME IS SHARON RACHAEL HUSKEY.

24                   DIRECT EXAMINATION

25  BY MR. DODGE:

1  Q.   MS. HUSKEY, GOOD AFTERNOON.

2  A.   GOOD AFTERNOON.

3  Q.   WHAT TOWN DO YOU LIVE IN?

4  A.   TRION.

5  Q.   DO YOU KNOW JAMES BART HUSKEY?

6  A.   I DO.

7  Q.   HOW DO YOU KNOW HIM?

8  A.   HE'S MY SON.

9  Q.   IF THE COURT GRANTS YOUR SON A BOND, ARE YOU WILLING TO

10 ALLOW HIM TO LIVE WITH YOU?

11 A.   WELL, YES.

12 Q.   WHAT TOWN DOES YOUR SON LIVE IN?

13 A.   LAFAYETTE.

14 Q.   AND HOW FAR AWAY IS THAT FROM TRION?

15 A.   15, 15 MILES MAYBE.  15 MILES.

16 Q.   WHO ELSE LIVES AT YOUR HOME?

17 A.   MY HUSBAND.

18 Q.   ANYONE ELSE?

19 A.   NO.

20 Q.   AND IS YOUR HUSBAND HERE IN COURT TODAY?

21 A.   HE IS NOT.

22 Q.   WHY NOT?

23 A.   HE HAS SOME RATHER FRAGILE HEALTH AND HIS PHYSICIAN

24 ADVISED HIM THAT IT WOULD BE BEST FOR HIM TO NOT COME DUE TO

25 THE STRESS.


UNITED STATES DISTRICT COURT

1  Q.   ANYONE ELSE LIVE IN THE HOUSE BESIDES YOU AND YOUR

2  HUSBAND?

3  A.   NO.

4  Q.   DO YOU HAVE A COMPUTER IN YOUR HOME?

5  A.   WE DO NOT OWN A COMPUTER OR -- NO.

6  Q.   DO YOU HAVE ANY INTERNET ACCESS AT YOUR HOUSE?

7  A.   NO.

8  Q.   ARE YOU WILLING TO PUT UP ANY OF YOUR OWN PROPERTY IN

9  ORDER TO HELP MAKE A BOND FOR YOUR SON?

10  A.   WELL, ALL THE PROPERTY WE HAVE IS OUR HOME.

11  Q.   ARE YOU WILLING TO PUT UP THE EQUITY IN YOUR HOME AS

12  COLLATERAL FOR THE BOND?

13  A.   YES, YES.

14  Q.   DO YOU ATTEND CHURCH?

15  A.   YES.

16  Q.   WHAT CHURCH?

17  A.   THE CHURCH OF CHRIST OF HALLS VALLEY WHERE MY HUSBAND IS A

18  MINISTER.

19  Q.   WHERE IS THAT LOCATED?

20  A.   THAT'S FIVE, SEVEN MILES FROM OUR HOME.

21  Q.   AND IS YOUR SON, BART HUSKEY, INVOLVED IN THE CHURCH?

22  A.   YES.

23  Q.   IN WHAT WAY?

24  A.   HE IS ONE OF OUR SONG LEADERS.  HE PARTICIPATES IN OUR

25  CLASSES.  HE OFFICIATES WITH OUR SACRAMENTS THAT ARE KNOWN AS

1   THE LORD'S SUPPER.  HE WAS IN THE PROCESS OF -- AS SOME OF THE

2   OTHER YOUNG MEN OF LEARNING TO PREPARE SERMONS AND PREACH IN

3   THE EVENT THAT THE ELDER HUSKEY BECAME DISABLED.  HE INSTIGATED

4   OUR PANTRY SERVICE MANY YEARS AGO.

5           IF THERE IS A NEED THAT REQUIRES A LITTLE BIT MORE

6   FINANCIAL HELP, IF HE HAS THE MONEY HE HELPS.  HE BRINGS US

7   NEWS OFTEN OF FAMILIES THAT ARE IN NEED THAT WE DON'T KNOW

8   ABOUT THAT WE CAN HELP.  AND WE JUST FIND THAT OUT THROUGH OUR

9   MEMBERS.  YOU KNOW HOW THAT GOES.  THIS FAMILY IS BURNED OUT,

10  THIS FAMILY IS FLOODED OUT, AND THEN WE HELP.  WE LEARN ABOUT

11  THEM THROUGH HIM.

12  Q.   HOW OFTEN DO YOU SEE YOUR SON?

13  A.   ONCE A WEEK AT THE CHURCH, NORMALLY.  ONCE IN A WHILE, BUT

14  VERY RARELY EXCEPT ON SUNDAY.

15  Q.   AND DO YOU HAVE A DAUGHTER, RACHAEL?

16  A.   I DO.

17  Q.   IS SHE IN COURT TODAY?

18  A.   SHE IS.

19  Q.   AND WHAT TOWN DOES SHE LIVE IN?

20  A.   SHE LIVES IN SUMMERVILLE.

21  Q.   HOW FAR IS THAT FROM TRION?

22  A.   SEVEN, EIGHT MILES, MAYBE.

23  Q.   DO YOU EVER HAVE ANY CHILDREN VISIT YOUR HOME?

24  A.   MY GRANDCHILDREN.

25           MR. DODGE:  I HAVE NO MORE QUESTIONS FOR YOU.  THE

1   PROSECUTOR MAY HAVE SOME QUESTIONS.

2          THE COURT:  ALL RIGHT.

3                    CROSS-EXAMINATION

4   BY MS. HAKES:

5   Q.   MRS. HUSKEY, DO ANY CHILDREN LIVE IN THE CITY OF TRION?

6   A.   DO CHILDREN LIVE IN THE CITY OF TRION?

7   Q.   YES, MA'AM.

8   A.   OH, YES.

9   Q.   THANK YOU.

10  A.   CHILDREN LIVE EVERYWHERE.

11         MS. HAKES:  THAT'S ALL I HAVE.

12         THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN,

13  MRS. HUSKEY.

14         THE WITNESS:  PARDON?

15         THE COURT:  YOU MAY STEP DOWN.

16         THE WITNESS:  THANK YOU.  AND GO WHERE?

17         MR. DODGE:  YOU MAY HAVE A SEAT IN THE COURTROOM.

18         THE COURT:  ALL RIGHT.

19         THE WITNESS:  CAN I GET MY PURSE?

20         I COULDN'T SAY ONE WORD, COULD I?

21         THE COURT:  NO, MA'AM.

22         ALL RIGHT.  ANY OTHER WITNESSES, MR. DODGE?

23         MR. DODGE:  NO, JUDGE.  I HAVE ARGUMENT.

24         THE COURT:  ALL RIGHT.  LET'S HEAR IT.

25         MR. DODGE:  WELL, AS THE COURT KNOWS, YOUR DECISION

1 ON BOND IS MEANT TO BE MADE ON THE LAW, NOT ON EMOTIONS, AND NO

2 MATTER HOW LOUDLY THE PROSECUTOR SPEAKS, THE LAW STILL APPLIES

3 THE SAME TO MR. HUSKEY AS IT APPLIES TO EVERYONE ELSE.

4         HE HAS SOME SUPPORTERS IN THE COURTROOM AS YOU CAN

5 SEE.  HIS FAMILY IS HERE WITH A COUPLE OF FAMILY FRIENDS WHO

6 ARE ALSO IN THE FIRST ROW WHO HAVE DRIVEN DOWN HERE TO SUPPORT

7 HIM TODAY.

8         WHILE MS. HAKES IS RIGHT THAT THE REBUTTABLE

9 PRESUMPTION APPLIES, SHE MISUNDERSTANDS WHAT THAT MEANS.  IT

10 DOESN'T MEAN CONGRESS HAS DECIDED MR. HUSKEY NEEDS TO BE HELD

11 IN JAIL WITHOUT BOND.  IT MEANS THAT WE HAVE THE BURDEN OF

12 PRODUCING EVIDENCE, QUOTE, "TO SUGGEST THAT HE IS EITHER NOT

13 DANGEROUS OR NOT LIKELY TO FLEE IF TURNED LOOSE ON BAIL."

14 THAT'S THE UNITED STATES VERSUS QUARTERMAIN, 913 F.2D AT 916,

15 1990 ELEVENTH CIRCUIT CASE.

16         WE MUST MAKE A PROFFER TO SHOW THAT, QUOTE, "WHAT IS

17 TRUE IN GENERAL IS NOT TRUE IN THIS PARTICULAR CASE."  AND

18 THAT'S UNITED STATES VERSUS JESUP, A FIRST CIRCUIT CASE FROM

19 1985.  AND ONCE WE MAKE OUR PROFFER, WHICH WE HAVE JUST MADE,

20 AND IN ADDITION TO THE PRETRIAL RELEASE REPORT AND EVEN TO

21 AGENT YODER'S TESTIMONY, ONCE WE MAKE THAT PROFFER, NOW THAT

22 THE BALL IS BACK IN THE GOVERNMENT'S COURT, AS YOU KNOW IT

23 STILL HAS THE BURDEN OF PERSUASION, EVEN IN A PRESUMPTION CASE,

24 TO PROVE THAT MR. HUSKEY IS A RISK OF FLIGHT BY A PREPONDERANCE

25 AND A DANGER TO THE COMMUNITY BY CLEAR AND CONVINCING EVIDENCE.

1  AND AGAIN, THE QUARTERMAIN CASE MAKES THAT CLEAR AS WELL AS

2  3142(F).

3          NOW, THE FACTORS THAT THE COURT HAS TO CONSIDER ARE

4  SET FORTH IN 3142(G).  THIS IS THE EXCEPTIONAL CASE.

5  MR. HUSKEY HAS LIVED AN IMPECCABLE LIFE IN ALL RESPECTS FOR HIS

6  38 YEARS.

7          FIRST THE COURT IS TO CONSIDER THE NATURE AND

8  CIRCUMSTANCES OF THIS CASE.  WELL, WE HAVE HERE A CASE THAT

9  INVOLVES CHILD PORNOGRAPHY AND CHILD MOLESTATION.  THOSE MAGIC

10 WORDS SORT OF SET OFF BELLS IN PEOPLE'S MINDS AND IT CAUSES

11 PEOPLE TO CLOSE THEIR MINDS OFF IMMEDIATELY AND TO WANT TO HEAR

12 NOTHING MORE.  AND SO EVEN INNOCENTLY ACCUSED FOLKS WHO ARE

13 ACCUSED OF THOSE WORDS ARE PUT IN TERRIBLE POSITIONS.  BECAUSE

14 JUST LIKE MS. HAKES TRIED TO DO A MOMENT AGO, THE EMOTIONS CAN

15 OVERRIDE EVERYTHING ELSE.  AND, OF COURSE, THE COURT IS NOT

16 GOING TO BE GUIDED BY EMOTION BUT ON THESE FACTORS.

17         AS THE COURT KNOWS, 3142(J), THE VERY SAME BAIL

18 REFORM ACT, SAYS THAT NOTHING IN THIS SECTION - AND THAT

19 INCLUDES A REBUTTABLE PRESUMPTION - SHALL BE CONSTRUED AS

20 MODIFYING OR LIMITING THE PRESUMPTION OF INNOCENCE.  AND, OF

21 COURSE, HERE WE ARE JUST A WEEK AFTER THE COMPLAINT, NOT EVEN

22 WITH AN INDICTMENT YET, AND OF COURSE MR. HUSKEY IS PRESUMED

23 INNOCENT.

24         ANY CONDITIONS THAT YOU IMPOSE ON MR. HUSKEY, JUDGE,

25 WILL ADDRESS ALL THE CONCERNS OF THE BAIL REFORM ACT.  THIS IS

1  NOT A CASE IN WHICH YOU CAN'T COME UP WITH APPROPRIATE

2  CONDITIONS.

3         THE SECOND FACTOR IS THE WEIGHT OF THE EVIDENCE.

4  WELL, THE COURT HAS HEARD THAT.  YOU HAVE FOUND PROBABLE CAUSE.

5  AS THE COURT KNOWS, THAT'S A LOW STANDARD.  IT'S SIMPLY A

6  PRELIMINARY HEARING.  IT'S FAR FROM PROOF BEYOND A REASONABLE

7  DOUBT.  AS YOU KNOW, THE GOVERNMENT HAS HAD A TWO-YEAR HEAD

8  START ON MR. HUSKEY AND MYSELF.  WE'VE HAD BUT SIX DAYS TO

9  PREPARE.

10         THE THIRD FACTOR IS THE HISTORY AND CHARACTERISTICS

11  OF MR. HUSKEY.  AS I SAID, THINGS HAVE BEEN IMPECCABLE FOR HIM

12  FOR 38 YEARS.  NO ARRESTS IN HIS LIFE, SUBSTANTIAL TIES TO THE

13  COMMUNITY, A GOOD WORK HISTORY, A SIGNIFICANT ROLE IN HIS

14  CHURCH.  AND REGARDLESS OF WHAT INNUENDOS THE AGENT WANTS TO

15  SET OUT THERE REGARDING OTHER ACCUSATIONS AND OTHER CHILDREN

16  AND TIPS, THERE ARE NONE OR HE WOULD HAVE TOLD US SO.

17         NUMBER FOUR IS THE NATURE AND SERIOUSNESS OF THE

18  DANGER TO ANY PERSON OR THE COMMUNITY.  WELL, I'LL TAKE THOSE

19  IN TURN.

20         FIRST, THERE IS NO DANGER TO THE PERSON OF RH IN THIS

21  CASE.  AGENT YODER TOLD US SHE IS IN PROTECTIVE CUSTODY OF THE

22  STATE.  AND THAT, OF COURSE, IS CONFIDENTIAL.  NO ONE,

23  INCLUDING US, WOULD KNOW WHERE SHE IS OR HAVE ANY ACCESS TO

24  HER, AND THAT INCLUDES MR. HUSKEY.  AND THERE IS NO DANGER TO

25  THE COMMUNITY, BECAUSE THE COURT CAN IMPOSE CONDITIONS THAT

1  WILL MAKE SURE THAT THERE IS NO DANGER WHATSOEVER.

2          AND THE ADAM WALSH ACT, OF COURSE, REQUIRES THE

3  IMPOSITION OF ELECTRONIC MONITORING AND WE WELCOME THAT.  WE

4  WELCOME THE OPPORTUNITY TO ALLOW MR. HUSKEY TO BE TRACKED AND

5  MONITORED AND IN FACT HE IS WILLING TO STAY AT HOME, AT HIS

6  PARENTS' HOME, AS LONG AS IT TAKES.

7          THE COURT CAN ALSO IMPOSE OTHER VERY IMPORTANT

8  CONDITIONS, SUCH AS HAVING NO CONTACT WITH WITNESSES, LIVING IN

9  ANOTHER TOWN, WHICH HE IS WILLING TO DO WITH HIS PARENTS, HOME

10 CONFINEMENT.  THERE WILL BE NO COMPUTER, NO INTERNET ACCESS.

11         HE HAS NOT THREATENED A SINGLE PERSON SINCE THE

12 MOMENT THE FBI KNOCKED ON HIS DOOR.  HE HAS NOT ATTEMPTED TO

13 FLEE.  HE HAS NOT ATTEMPTED TO CONTACT OR INFLUENCE ANYBODY AND

14 THAT OBVIOUSLY SUGGESTS THAT HE IS NOT A DANGER TO THE

15 COMMUNITY.

16         WITH ALL OF THAT SAID, JUDGE, WE REQUEST A BOND IN

17 WHICH THE PARENTS CAN PUT UP THEIR HOUSE AS COLLATERAL.  AND I

18 HAVE DONE SOME WORK WITH THEM ON GATHERING TOGETHER THE DEED,

19 THE MORTGAGE STATEMENT FROM THE BANK AND THE LAST TAX

20 ASSESSMENT FROM WALKER COUNTY TAX ASSESSORS.  AND THERE IS SOME

21 EQUITY IN THE HOUSE, JUDGE.  IT APPEARS TO BE SOMEWHERE IN THE

22 RANGE OF TEN TO $20,000, WHICH IS NOT A LOT, BUT THE FAMILY IS

23 WILLING TO PUT THAT UP ANYWAY.  AND WHETHER THEY HAVE $500,000

24 EQUITY OR $10,000 THE EFFECT WILL BE THE SAME ON THEM IF

25 MR. HUSKEY SKIPS COURT.  THAT IS, THEY WILL LOSE THEIR HOUSE.


UNITED STATES DISTRICT COURT

1    AND THESE ARE OLDER FOLKS WITH HEALTH PROBLEMS AND THEY CANNOT

2    AFFORD TO LOSE THEIR HOUSE AND THEY ARE PUTTING THAT ON THE

3    LINE FOR THEIR SON IN SPITE OF THESE EMOTIONAL CHARGES THAT YOU

4    HAVE HEARD ABOUT TODAY.

5              THANK YOU.

6              THE COURT:  ALL RIGHT.

7              MS. HAKES:  YOUR HONOR, IF I MAY LASTLY, I JUST

8    WANTED THE COURT TO BE AWARE.  I BELIEVE IT WAS FRIDAY THE

9    STATE LODGED A VARIETY OF CHARGES AGAINST MR. HUSKEY IN WALKER

10   COUNTY, INCLUDING RAPE AND AGGRAVATED CHILD MOLESTATION.

11             THE COURT:  SO PRESUMABLY THERE MAY BE ANOTHER

12   DETAINER OF SOME KIND AT SOME POINT, BUT THERE IS NOT RIGHT

13   NOW?

14             MS. HAKES:  NO DETAINER THAT I AM AWARE OF, YOUR

15   HONOR, JUST THE WARRANTS.

16             THE COURT:  ALL RIGHT.  I UNDERSTAND THAT.

17             MR. DODGE:  JUDGE, COULD I INQUIRE?  IS THAT THE SAME

18   SET OF FACTS THAT LED TO THIS FEDERAL CASE?

19             MS. HAKES:  IT IS.

20             THE COURT:  ALL RIGHT.  WELL, IN THESE CASES, AS BOTH

21   SIDES HAVE POINTED OUT, THERE IS A PRESUMPTION THAT ARISES BY

22   VIRTUE OF THE NATURE OF THE CHARGE AND THE PRESUMPTION IS THAT

23   THE DEFENDANT BE DETAINED.  IT IS A REBUTTABLE PRESUMPTION.

24   THAT MEANS IT CAN BE REBUTTED.  BUT EVEN IF IT'S REBUTTED, IT

25   REMAINS IN THE CASE AND IS TAKEN INTO CONSIDERATION WITH ALL

1  THE OTHER FACTORS THAT THIS COURT IS REQUIRED TO CONSIDER

2  BEFORE DETERMINING WHETHER OR NOT A DEFENDANT CAN BE RELEASED

3  ON BOND OR WHETHER HE SHOULD BE DETAINED.

4         IN THIS CASE A NUMBER OF THOSE FACTORS HAVE BEEN

5  POINTED OUT BY MR. DODGE ON BEHALF OF THE DEFENDANT AND, OF

6  COURSE, THE GOVERNMENT HAS MADE ARGUMENTS WITH REGARD TO

7  RELEVANT FACTORS AS WELL.  SO I START WITH THE FACT THAT THERE

8  IS A PRESUMPTION OF DETENTION.

9         I DO CONCLUDE, AFTER HEARING ALL OF THIS EVIDENCE AND

10  TAKING IT INTO CONSIDERATION, THAT THE GOVERNMENT'S MOTION FOR

11  DETENTION SHOULD BE GRANTED.  A NUMBER OF FACTORS LEAD ME TO

12  THAT CONCLUSION.  SOME HAVE BEEN POINTED OUT BY THE GOVERNMENT.

13  OTHERS ARE APPARENT FROM THE RECORD.  BUT AT LEAST IN PART MY

14  DECISION IS BASED UPON THE ONGOING NATURE OF THE OFFENSE THAT'S

15  CHARGED HERE - IT OCCURRED OVER A NUMBER OF YEARS - THE WEIGHT

16  OF THE EVIDENCE WHICH MR. DODGE ALLUDED TO AS WELL AS THE

17  GOVERNMENT, BUT THE WEIGHT OF THE EVIDENCE IN THIS CASE IS

18  HEAVY, WHICH INCLUDES BUT IS NOT LIMITED TO THE DEFENDANT'S

19  ADMISSIONS.

20         THE NATURE OF THE OFFENSE AND WHAT IS INVOLVED WITH

21  THE OFFENSE, OF COURSE, IS A FACTOR TO BE CONSIDERED, AND IN

22  THIS CASE AS FAR AS DANGER GOES, THERE IS EVIDENCE OF VIOLENT

23  IMAGERY INVOLVED IN THIS IN TERMS OF BOTH THE DEPICTIONS AND

24  THE VIDEOS THAT SUGGESTS DANGER.  THE DANGER IS NOT NECESSARILY

25  LIMITED TO THE VICTIM IN THIS CASE BUT POTENTIALLY TO OTHERS.

1  THERE IS INDICATION OF RECENT SEXUAL CONDUCT THAT PRECEDED THE

2  DATE OF THE ARREST BY POSSIBLY A MATTER OF HOURS.

3          SO, TAKING INTO ACCOUNT THE PRESUMPTION, THE NATURE

4  OF THE OFFENSE, THE WEIGHT OF THE EVIDENCE, THE OTHER FACTORS

5  THAT ARE SET FORTH IN 3142, I CONCLUDE THAT THE PRESUMPTION IS

6  NOT REBUTTED, BUT EVEN IF IT WERE REBUTTED, I DO NOT FIND THERE

7  ARE ANY CONDITIONS OR COMBINATION OF CONDITIONS THAT I COULD

8  REASONABLY IMPOSE THAT WOULD ASSURE THE SAFETY OF THE COMMUNITY

9  OR ASSURE THE APPEARANCE OF THE DEFENDANT AT TRIAL.

10          SO I GRANT THE MOTION FOR DETENTION AND DIRECT THAT

11  THE DEFENDANT, MR. HUSKEY, BE REMANDED TO THE CUSTODY OF THE

12  UNITED STATES MARSHALS SERVICE TO ABIDE THE RESOLUTION OF HIS

13  CASE.  I WILL ENTER A WRITTEN ORDER AS REQUIRED UNDER 3142

14  AFTER I COME OFF THE BENCH.

15          IS THERE ANYTHING FURTHER THAT THE COURT NEEDS TO

16  ADDRESS THIS AFTERNOON?

17          MS. HAKES:  NOT FROM THE GOVERNMENT.

18          THE COURT:  ANYTHING ELSE, MR. DODGE?

19          MR. DODGE:  NO, JUDGE.

20          THE COURT:  ALL RIGHT.  THANK YOU.

21          WE WILL BE IN RECESS.

22              (PROCEEDINGS CONCLUDED)

23

24

25

UNITED STATES DISTRICT COURT

1                C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA

4   NORTHERN DISTRICT OF GEORGIA

5          I, DAVID A. RITCHIE, OFFICIAL COURT REPORTER OF THE

6   UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

7   GEORGIA, DO HEREBY CERTIFY THAT THE FOREGOING 50 PAGES

8   CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE SAID

9   COURT, HELD IN THE CITY OF ATLANTA, GEORGIA, IN THE MATTER

10  THEREIN STATED.

11         IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS,

12  THE 8TH DAY OF JULY, 2008.

13

14

15                        _____

16                        DAVID A. RITCHIE
                          OFFICIAL COURT REPORTER
17                        NORTHERN DISTRICT OF GEORGIA

18

19

20

21

22

23

24

25


                    UNITED STATES DISTRICT COURT